**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **INDIANAPOLIS LIFE INSURANCE COMPANY,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | **CIVIL ACTION NO. 1:06-CV-2152** |
| | : | |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| **DEBORAH HENTZ, Trustee, et al.** | : | |
| | : | |
| **Defendants** | : | |
| | : | |
| . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | : | |
| | : | |
| **RICHARD W. WALLACE et al.,** | : | |
| | : | |
| **Third-Party Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **AMERUS GROUP CO. et al.** | : | |
| | : | |
| **Third-Party Defendants** | : | |

**MEMORANDUM**

Plaintiff and Counterclaim Defendant Indianapolis Life Insurance Company

("Indianapolis Life") is an Indiana corporation authorized to sell and issue insurance policies in

the state of Delaware.  Indianapolis Life is a subsidiary of Third-Party Defendant AmerUs Group

Co. ("AmerUs Group").  Third-Party Defendant AmerUs Life Insurance Co. ("AmerUs Life") is

also a subsidiary of AmerUs Group.  Third-Party Defendant Frederick Saide ("Saide") worked as

an agent for Indianapolis Life during the relevant time-period of the alleged conduct underlying

the Third-Party Complaint.

Defendants, Counterclaim Plaintiffs, and Third-Party Plaintiffs Richard W. Wallace and

Rebecca J. Wallace ("Wallaces") are residents of Newport, Pennsylvania whose lives were

insured by consecutive life insurance policies issued by Indianapolis Life.  Defendant,

Counterclaim Plaintiff, and Third-Party Plaintiff Laurie M. Mason ("Trustee") is trustee for

Third-Party Plaintiff The Richard W. Wallace and Rebecca J. Wallace Irrevocable Trust

("Trust"), which is an irrevocable trust formed under the laws of the State of Delaware.  The

Trust is formed for the benefit of the Wallaces, who are also its settlors.[1]

Before the Court are motions to dismiss filed by Saide, Indianapolis Life, AmerUs Life,

and AmerUs Group (collectively the "Movants") to dismiss counts I, III, IV, V, VI, VII, VII, IX,

X, and XI of the counterclaim and third-party complaint ("Complaint") of the Wallaces, the

Trustee, and the Trust (collectively the "Complainants"), pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure.  Fed. R. Civ. P. 12(b)(6).  In addition, the motion seeks to

completely dismiss the Trust from this action.  This motion has been fully briefed and is ripe for

disposition.

## I.  BACKGROUND

### A.  Factual Background[2]

The allegations in the Complaint arise out of a series of insurance transactions that took

place between early 2005 and May 2006.  The Wallaces, a married couple, decided in the course

of reviewing their estate plan and insurance portfolio to purchase a new life insurance policy.

(Doc. No. 3 at 14 ¶ 8.)  They contacted Saide, an agent for Indianapolis Life, who advised them

to terminate an existing life insurance policy that the Wallaces had previously purchased and to

---

[1]  Defendant Deborah Hentz did not join in the Counterclaim and Third-Party Complaint.

[2]  The following facts, which are accepted as true for purposes of this decision, are taken from the Counterclaim and Third-Party complaint.

transfer the proceeds into a new policy that would be issued to them by Indianapolis Life.  (Id. at 15 ¶ 9.)   Saide worked out an arrangement to finance the premiums on a $4.1-million policy through a loan from Credit Suisse, a financial services company.  (Id. at 15 ¶ 10.)  After a time, the loan could be paid off with the compounded cash value of the policy.  (Id.)  To demonstrate the viability of the policy and loan arrangement he had proposed, Saide and his employer Indianapolis Life provided the Wallaces with an illustration ("Initial Illustration") "of a policy to be purchased from the Insurance Company."  (Id. at 15 ¶ 11.)  Saide explained that "if they over-funded the life insurance policy under the Initial Illustration . . . it would give Mr. and Mrs. Wallace an ability to pay off amounts borrowed [from Credit Suisse] to finance the premiums of the policy."  (Id. at 16 ¶ 11.)  The Wallaces believed that they would be issued a policy in accordance with the Initial Illustration based on the representations of Saide and Indianapolis Life. (Id. at 16 ¶ 12.)

The Wallaces decided to go forward with the proposed deal and purchase a life insurance policy in Pennsylvania.  (Id. at 16 ¶ 13)  Even though Saide knew that Credit Suisse was not able to provide premium financing on life insurance premiums in Pennsylvania, he recommended the Wallaces apply for the loan from Credit Suisse.  (Id.)  As it turned out, Credit Suisse was indeed not able to provide the loan.  (Id.)  At this point, some time had elapsed[3] since the Wallaces' initial application for insurance, and Saide warned them that they would not be able to lock in the policy under the terms of the Initial Illustration if any further delay occurred.  (Id. at 16-17 ¶¶ 14-15.)  To avoid this problem, Saide proposed that: Indianapolis Life issue the Pennsylvania

_____

[3]  It is unclear from the Complaint exactly how much time passed up until this point, but it is alleged that the Wallaces initially contacted Saide and Indianapolis Life in "early" 2005 and that the first Pennsylvania policy was issued on March 14, 2005.  (Doc. No. 3 at 14 ¶ 8.)

policy immediately so the Initial Illustration would be effective, the Wallaces personally pay the first premium due on the policy, and that the Wallaces form a trust in Delaware so that the Trust could apply for the insurance in a state where Credit Suisse would not be prohibited from making loans to fund the insurance premiums.  (Id.)  After these steps, the Pennsylvania policy would be cancelled and the Initial Illustration would be effective as to the Delaware Policy.  (Id.)

The Wallaces agreed to Saide's plan, and on March 14, 2005, Indiana Life issued the Pennsylvania policy.  (Id. at 17 ¶ 16.)  On November 16, 2005, the Trustee and the Wallaces formed the Trust.  (Id. at 18 ¶ 17.)  The Trust applied for the new Delaware life insurance policy on November 22, 2005, and executed the loan and security agreement with Credit Suisse on November 23, 2005.  (Id. at 18 ¶¶ 17-18.)  The loan and security agreement provided that the trust would assign its rights to any proceeds of the policy to Credit Suisse and pledge collateral for the amounts borrowed, which would be based on the cash value of the Delaware policy as provided in the Initial Illustration.  (Id. at 19 ¶ 19.)  The Delaware policy was issued in December 2005, and sent directly to Credit Suisse, which paid the first premium on January 12, 2006.  (Id. at 19 ¶ 21-22.)

Based on the foregoing statements of Saide and Indianapolis Life, The Wallaces and the Trustee believed "that the Trust had a . . . policy . . . in accordance with the Initial Illustration." (Id. at 20 ¶ 23.)   Saide and Indianapolis Life knew the Delaware policy did not incorporate the Initial Illustration.  (Id.)  In January 2006, Indianapolis Life provided an illustration of the Delaware policy to Credit Suisse (but not to the Wallaces or the Trustee) that showed that the policy was worth less than the Initial Illustration, which meant that the Wallaces' pledged collateral was insufficient to cover the loan.  (Id. at 21 ¶ 24.)  Reacting to this insufficiency,

Credit Suisse issued a notice of default to the Trust threatening to surrender the insurance policy unless the Trust paid additional collateral in the amount of $78,000 dollars.  (Id. at 22 ¶ 27.)  At this point, the Wallaces unsuccessfully attempted to secure a copy of the policy from Indianapolis Life.  Rather than produce the policy itself, Indianapolis Life provided them another illustration showing the values of the Delaware policy, which were diminished in comparison to the Initial Illustration.  (Id. at 23 ¶ 29.)  After incurring significant expenses investigating the matter, the Wallaces directed the Trustee to surrender the policy to Credit Suisse.  (Id. at 24 ¶ 30.)  The present action commenced after the Wallaces refused to pay Indianapolis Life for amounts still due under the surrendered policy and demanded reimbursement for premiums and their expenses.  (Id. at 24 ¶ 31.)

## B.  Procedural Background

Indianapolis Life commenced the present action by filing a complaint for declaratory judgment on November 1, 2006.  (Doc. No. 1.)  The Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332.  The Defendants answered the complaint, made a counterclaim against Indianapolis Life, and brought AmerUs Life, AmerUs Group, and Saide into the action by way of a third-party complaint filed on November 22, 2006.  (Doc. No. 3.)  On January, 29, 2007, the present motion to dismiss pursuant to Rule 12(b)(6) was filed by Indianapolis Life, AmerUs Life, and AmerUs Group.  (Doc. No. 31.)  Saide sought and obtained leave of the Court to join in this motion and file his own.  (Doc. No. 36.)  The motions have been fully briefed by all parties (Doc. Nos. 32, 39, 55, 59) and are ripe for disposition.  For the reasons that follow, the motions will be granted in part and denied in part.

## II.    STANDARD OF REVIEW AND CHOICE OF LAW

**A.  Standard of Review**

The Movants have brought this motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).

The Supreme Court's recent opinion in *Bell Atlantic Corp. v. Twombly,* has altered the standard of review for a motion to dismiss pursuant to Rule 12(b)(6).  Phillips v. County of Allegheny, 515 F.3d 224, 230 (3d Cir. 2008).  In construing the Rule 12(b)(6) standard generally, the Court required the plaintiff to provide more than a formulaic recitation of a claim's elements that amounted to mere labels and conclusions.  Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007).  Additionally, the complaint's "factual allegations must be enough to raise a right to relief above the speculative level."  Id.

The Third Circuit has held that the language in *Twombly* applies generally to all motions brought under Rule 12(b)(6).  Phillips, 515, F.3d at 232.  Despite the seemingly altered standard from *Twombly*, it is still true that "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Id. (quoting Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).

**B.  Choice of Law**

When a federal court is exercising subject matter jurisdiction over an action with state law claims pursuant to 28 U.S.C. § 1332, it must apply the substantive law of the state to those claims.  Erie R. Co. v. Tompkins, 304 U.S. 64, 79 (1938).  One aspect of this rule is that a federal court must apply the conflict of law principles of the state in which it sits.  Klaxon Co. v.

Stentor Electric Mfg., 313 U.S. 487, 496 (1941).  Both parties agree that Delaware law should

apply to the state law claims in this matter.  (Doc. No. 32 at 3; Doc. No. 55 at 7.)  Having

considered the interests and contacts of Delaware applicable to the present dispute as required by

Pennsylvania choice of law principles, the Court will apply Delaware substantive law to the state

claims brought in the Complaint.

## III.  DISCUSSION

As an initial matter, the motion is unopposed on several points.  Both parties agree that

the Trust itself is not a proper party.  (Doc. No. 31 ¶ 1; Doc. No. 55 at 5.)  Having considered the

arguments and authorities cited by Movants, the Court agrees that the trust is not a proper party

and it will be dismissed from this action.  Both parties also agree that Count X of the Complaint

(Insurance Fraud) should be dismissed because Del. Code. Ann. 18 § 2407 does not provide a

private right of action.  (Doc. No. 31 ¶ 8; Doc. No. 55 at 5.)  Considering the arguments raised in

the Movants' brief and the agreement of the parties, the Court will grant dismissal of Count X of

the Complaint.

Finally, the Complainants state that they will "withdraw the Count of bad faith breach of

contract without prejudice."  The Court takes this statement to mean that the motion to dismiss is

unopposed as to Count VI.[4]  A claim for bad faith breach of contract is only recognized by

Delaware courts when an insurer delays or fails to process a claim without reasonable

justification.  Tackett v. State Farm Fire and Cas. Ins. Co., 653 A.2d 254, 263 (1995) (citing

Casson v. Nationwide Ins. Co., 455 A.2d 361 (Del. Super. 1982).  The allegations in the

---

[4]  A dismissal pursuant to Rule 12(b)(6) is a summary disposition on the merits and is presumed to be with
prejudice.  See Johnsrud v. Carter, 620 F.2d 29, 32-33 (3d Cir. 1980).

Complaint do not suggest that there was any delay or failure to process a claim on the life insurance policy at issue in this case.  As such, Count VI will be dismissed.

The remaining Counts challenged by the Movants are: I (Fraudulent Inducement), III (Negligence), IV (Common Law Fraud), V (Negligent Misrepresentation), VII (Breach of the Duty of Fair Dealing), VIII (Consumer Fraud), IX (Deceptive Trade Practices), and XI (Racketeer Influenced and Corrupt Organizations "RICO").  Since many of the Movants' arguments for dismissal pertain to several Counts, they will be considered in groups based on the applicable argument for dismissal.

### A.  Failure to Allege a Misrepresentation

Movants' argue that Counts I, IV, V, VIII, IX, and XI are insufficient because the complaint fails to allege a false representation, which is a common required element to all of the Counts.[5] (Doc. No. 32 at 5.)  The Complainants contend that the Complaint, viewed as a whole, sufficiently alleges misrepresentations to support the common element of those counts.  (Doc. No. 55 at 8.)

Paragraph 13 of the Complaint contains an allegation that "[e]ven though he knew at the time that Credit Suisse was not authorized to finance premiums for insurance policies in Pennsylvania, Saide assured the Wallaces that Credit Suisse would be able to provide premium financing on the Pennsylvania Policy."  (Doc. No. 3 at 16 ¶ 13.)  After Credit Suisse refused to

---

[5]  See, e.g., Stephenson v. Capano Development, Inc., 562 A.2d 1069, 1074 (Del. 1983) (listing "a false representation" as the first element of common law fraud); E.I. DuPoint de Nemours & Co. v. Florida Evergreen Foliage, 744 A.2d 457, 461 (Del. 1999) (explaining that fraudulent inducement includes the elements of a common law fraud); H-M Wexford L.L.C v. Encorp, Inc., 832 A.2d 129, 147 n.44 (Del. Ch. 2003) (an element of negligent misrepresentation is the supplying of false information);  Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984) (fraud is an inherent element in a RICO claim alleging mail and wire fraud); Grand Ventures, Inc. v. Whaley, 632 A.2d 63, 65-66 (Del. 1993) (finding that both the Deceptive Trade Practices Act and the Consumer Fraud Act were passed to protect consumers from deception on the part of businesses).

issue the loan in Pennsylvania, Saide then informed the Wallaces that they could not delay any further and proposed an elaborate plan to lock in the Initial Illustration that required them to immediately purchase and personally pay for the Pennsylvania policy. (Doc. No. 3 at 16 ¶¶ 15, 16.) Even though the Wallaces immediately acquired the Pennsylvania policy, paid the premiums, and followed the other steps of Saide's plan, the resulting Delaware policy did not conform to the Initial Illustration despite Saide's representations to the contrary. (Id. at 17-20, ¶¶ 16-22; id. at 23 ¶ 29.)

While the allegations are vague and non-specific (a deficiency addressed below), a court must consider the complaint as a whole and also any fair inferences that can be drawn from the allegations. A fair inference here is that Saide (and through him, Indianapolis Life) supplied false information by advising the Wallaces to apply for a loan that he knew would not be available. Saide also misled the Wallaces into following the steps of his plan when he falsely represented that it would lock in a new Delaware policy under the terms of the Initial Illustration, which also turned out to be false. The Movants argue: "the words 'misrepresentation,' 'misleading' or 'false' do not appear in the factual allegations section of the counterclaim." Despite this, a fair inference from the stated allegations is that false and misleading representations were made to the Wallaces and the Trustee that could support the misrepresentation element inherent in the above causes of action.

## B.  Economic Loss Doctrine

The Movants' contend that Counts I, III, IV, and V should be dismissed because of Delaware's Economic Loss Doctrine, which prohibits recovery in tort for purely economic losses, unaccompanied by bodily harm or property damage. (Doc. No. 32 at 8.) Complainants

do not deny that they are only seeking recovery for economic loss, but argue instead that the tort

claims should not be dismissed because they arise from a breach of duty independent of the

contract at issue.  (Doc. No. 55 at 20.)  Further, they argue that Counts I and V should not be

dismissed because Delaware provides exceptions to the economic loss doctrine for fraudulent

inducement and negligent misrepresentation.  (Id. at 23.)

### 1. Independent Duty

The economic loss doctrine began as a judicially created limitation in product liability

actions prohibiting recovery in tort where a defective product damaged only itself and did not

cause personal injury or damage to other property.  See Danforth v. Acorn Structures, Inc., 608

A.2d 1194, 1195 (Del. 1992).  The application of this doctrine has grown beyond its origin in

products liability to cover any commercial transaction involving a contract where the alleged

damages do not include injury to a person or to property other than the bargained-for item.

Christiana Marine Serv. Corp. v. Texaco Fuel and Marine Mktg., No. 98C-02-217WCC, 2002

WL 1335360, at *5 (Del. Super. Ct. June, 13, 2002).  As such, for contract claims and tort claims

to co-exist in an action, the tort claims must arise from a duty that is independent of the duties

imposed by the contract.  McKenna v. Terminex Intern. Co., No. 04C-02-022RBY, 2006 WL

1229674, at *2 (Del. Super. Ct. March 13, 2006).  The doctrine illustrates the judicial preference

for application of contract law to disputes because it provides a better and more specific remedy

than tort law.  Brasby v. Morris, No. 05C-10-022-RFS, 2007 WL 949485, at *6 (Del Super. Ct.

March 29, 2007).

Here, the Complainants do not deny that the insurance contract contained the duties

governing the relationship between the parties.  Instead, the Complainants argue that Saide had

independent duties beyond those "arising under *any* contract."  (Doc. No. 55 at 19 (emphasis

added).)  Delaware law is clear that insurance companies do not owe any special duties to policy

holders outside of the insurance contract itself.  <u>Cross v. BCBSD, Inc.</u>, 836 A.2d 492, 493 (Del.

2003).  The Delaware Supreme Court has held that "the concept of a fiduciary relationship,

which derives from the law of trusts, is more aptly applied in legal relationships where the

interests of the fiduciary and the beneficiary incline toward a common goal in which the

fiduciary is required to pursue solely the interests of the beneficiary in the property."  <u>Corrado</u>

<u>Bros. v. Twin City Fire Ins. Co.</u>, 562 A.2d 1188, 1192 (Del. 1989).  A typical insurance contract

does not fit this standard because the interests of the insurance company and its policy holders

will not always align.  <u>Cross</u>, 836 A.2d at 495.  Additionally, agents of the insurance company

share the same contractual duty with the policy holders as the company; the legal consequences

of the agent's acts are the same as if the insurance company had performed them.  <u>See</u> <u>Thomas v.</u>

<u>Harford Mut. Ins. Co.</u>, No. 01C-01-046 HDR, 2003 WL 21742143, at *1 (Del. Super. Ct. July

25,  2003).

   Complainants do not deny that Saide was an agent for the insurance company and not

their personal insurance broker, but contend that Saide had an independent common-law[6] duty of

care in communicating information to the Wallaces.  (Doc. No. 55 at 20.)  Complainants further

argue that Saide's breach of this duty is imputed to the insurance company by way of respondeat

superior.  (Doc. No. 55 at 20.)  In support of this proposition, they cite <u>Guardian Const. Co. v.</u>

<u>Tetra Tech Richardson, Inc.</u>, A.2d 1378, 1385-86 (Del. Super. Ct. 1990), wherein the Delaware

---

[6] Previously, counsel for the Complainants also argued an independent statutory duty existed in Delaware
for insurance agents, but that argument has been withdrawn.  (Doc. No. 66 at 1.)

Superior Court adopted the Restatement (Second) of Torts § 552 ("RST 552").[7] The two plaintiffs in *Tetra Tech* were not in a contractual relationship with a design engineer that had supplied information to them, so no breach of contract action was available, and the economic loss doctrine would have precluded recovery in tort.  Id.  The court therefore adopted RST 522 as a limited exception to the economic loss doctrine solely for claims of negligent misrepresentation to avoid a situation where no remedy existed.  See Christiana, 2002 WL 1335360, at *6.  This narrow application is evident in the court's express limitation that it did not intend to "state a general rule which applies to all professions in all situations."  Id.  As such, the Complainants cannot rely on *Tetra Tech* or the RST 552 exception to support the separate tort causes of action merely by suggesting it imparts an independent duty on all insurance agents.

Complainants also cite Stuchen v. Duty Free International, Inc., No. 94C-12-194, 1996 WL 33167249, at *11-12 (Del. Super. Ct. April 22, 1996), but there the court found no reason to impose independent duties on the agents at issue and dismissed the negligent misrepresentation claims.  Further, the rest of the cases cited by the Complainants do not construe Delaware law and are otherwise unpersuasive considering the Delaware precedent discussed above.

While RST 552 will be considered further in connection with the exception to the economic loss doctrine for negligent misrepresentation, it is clear that insurance companies and

---

[7] The Restatement (Second) of Torts § 552 provides in relevant part:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552.

their agents do not have independent duties beyond the insurance contract under Delaware law. Given the express limitations of the *Tetra-Tech* holding, the Court cannot construe § 522 as creating a general duty of care for all insurance agents, as proposed by the Complainants.  The negligence and common law fraud claims relate directly to the performance of the contract underlying this dispute and merely recast the dispute in tort language.  Thus, the economic loss doctrine bars Counts III and IV, and they will be dismissed.

### 2.  Fraudulent Inducement

While the Court does not accept the Complainants' argument in defense of the common law fraud and negligence claims, this does not dispose of the fraudulent inducement claim. Under Delaware Law, there is support for the proposition that an independent duty exists not to engage in fraud to induce a contractual relationship.  See Brasby, 2007 WL 949485, at *7 (holding that "allegations of fraud that go directly to the inducement of the contract, rather than its performance, would present a viable claim").  The fraudulent inducement necessarily arises before the contract even exists so the claim cannot rest on any duty contained in the contract.[8] Id.

The Complainants have alleged enough in their complaint to support the fraudulent inducement claim.  (Doc. No. 3 at 17 ¶ 15.)  As such, the motion to dismiss Count I will be denied.

### 3.  Exception for Negligent Misrepresentation under RST § 552

---

[8] The Court notes that there is some dispute about whether this reasoning is sound.  *Compare* Budgetel Inns, Inc. v. Micros Sys., Inc., 8 F. Supp. 2d 1137 (E.D. Wis. 1998) (concluding that fraudulent inducement claims are never barred by the economic loss doctrine because they must occur before the contract is formed), *with* Huron Tool & Engineering Co. v. Precision Consulting Serv., Inc., 209 Mich. App. 365, 532 N.W.2d 541, 545 (1995) (finding that fraudulent inducement claims were also blocked by the economic loss doctrine where the only misrepresentation by the dishonest party concerns the quality or character of the goods sold).

As discussed above, RST 552 does not establish an independent duty of care for all professions, but Delaware courts have recognized it as a limited exception to the economic loss doctrine in claims of negligent misrepresentation.  Christiana, 2002 WL 1335360, at *6.  The RST 552 exception is limited to situations where "the defendant supplied the information to the plaintiff for use in business transactions with third parties." Id.  (quoting Danforth v. Acorn Structures, Inc., No. 90C-JN-30, 1991 WL 269956 at *5 (Del. Super. Ct. Nov. 22, 1991)).  Additionally, the defendant must be in the business of supplying information.  Christiana, 2002 WL 1335360 at *6.

The first requirement—that the defendant supplied information for use in business transactions with third parties—is met by the allegations in the Complaint.  Saide and Indianapolis Life provided the Wallaces and Trustee with information regarding the value of a new insurance policy. (Doc. No. 3 at 15 ¶ 11.)   The Wallaces and Trustee used this information to secure a loan from Credit Suisse, a third party to the insurance policy transaction at issue. (Doc. No. 3 at 19 ¶ 19.)  It is also alleged that Credit Suisse calculated the loan collateral based on the cash value given in the Initial Illustration to the Wallaces.  (Id.)  As such, Indianapolis Life and Saide supplied information to the Wallaces for use in a business transaction with the third party Credit Suisse.  Delaware courts have found the first requirement of the RST 552 exception met under similar circumstances involving a third-party loan agreement.  See Christiana, 2002 WL 1335360, at *6.

As for the second requirement, Delaware law does not delineate a list of businesses that are in the business of "supplying information."  Id.  The court is required to engage in "[a] precise, case-specific inquiry . . . to determine whether a particular enterprise is in the business

of supplying information for the guidance of others in their business transactions." Id. (quoting

Rankow v. First Chicago Bank, 870 F.2d 356, 360-366 (7th Cir.1989)).  Most businesses provide

information, but a business will not be found to meet this requirement where that information is

provided in connection with the sale of a product or services and relates the information relates

only to those goods and services.  Id. at 7 (quoting Tolan and Son, Inc. v. KLLM Architects,

Inc., 719 N.E.2d 288, 295 (Ill App. Ct. 1999)).  Because of the intensive factual nature of this

inquiry, it not always clear whether or not the business is "supplying information."  Id.

Neither the parties nor the Court's independent research have revealed a Delaware case

analyzing the information provided by an insurance company for purposes of the RST 552

exception, but Delaware has relied to some extent on Illinois precedent in this area.  Id. at 6.

Illinois courts have found that life insurance companies were "a difficult case," considered

somewhere between pure information provider (such as accountants) and pure tangible good

providers (such as manufacturers).  Tolan, 719 N.E.2d at 297.

In this case, the allegations of the complaint are sufficient to sustain this second

requirement.  Indianapolis Life and Saide were trying to sell the Wallaces a life insurance policy,

so the information was provided with the ultimate goal of selling a product.  But, the information

provided to the Wallaces did not relate only to the sale of the insurance policy.  For instance,

Saide advised the Wallaces to apply for loans from a specific third-party bank.  (Doc. No. 3 at 16

¶ 13.)  Further, Saide contacted counsel in Delaware for the Wallaces to draw up a trust

agreement.  (Doc. No. 3 at 16 ¶ 17.)  Because of the early stage of this case and the difficult

nature of applying the RST 552 exception to life insurance companies in general, the Court finds

that these allegations are enough to raise an inference that Indianapolis Life and Saide were in

15

the business of supplying information for the guidance of the Wallaces.

As such, the negligent misrepresentation cause of action pleaded here satisfies the requirements of RST 552 and qualifies as an exception to the economic loss doctrine.  The motion to dismiss Count V will be denied.

### B.  Failure to Plead Fraud with Particularity

The Movants' argue that Counts I, IV,[9] VIII, and XI of the counterclaim are deficient because they are not plead with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure.  (Doc. No. 32 at 7.)  They also contend that Count V is deficient because even though Rule 9(b) is not applicable to a claim of negligent misrepresentation, it still must be pled with a degree of specificity.  (Id.)  The Complainants argue that the claims for consumer fraud and negligent misrepresentation do not require any heightened pleading standard.  (Doc. No. 55 at 11–12.)  They also argue that, to the extent Rule 9(b) does apply, the allegations place the Movants on sufficient notice to satisfy the particularity requirements of the rule.  (Id.)

### 1.  Rule 9(b) and Delaware's Consumer Fraud Act

Rule 9(b)[10] is limited by its terms to claims of mistake and fraud, but it applies "to all cases where the gravamen of the claim is fraud even though the theory supporting the claim is not technically termed fraud."  Toner v. Allstate Ins. Co., 821 F. Supp. 276, 283 (D. Del. 1993).

---

[9]  The Court notes that Count IV was found to be barred by application of the economic loss doctrine so consideration in this section is an alternative basis to dismiss the claim.

[10]  Rule 9(b) provides:

> In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

Fed. R. Civ. P. 9(b).

The heightened requirements of Rule 9(b) are meant to protect defendants from frivolous suits that could potentially damage a defendant's reputation and goodwill.  See Seville, 742 F.2d at 791.  The particularity requirement accomplishes this goal by giving notice of the specific misconduct at issue so the defendant can prepare a defense to the claim.  Toner, 821 F. Supp at 284.  The requirement of specificity also prevents fraud claims meant as a fishing expedition to obtain material facts by way of the discovery process.  Id.  As such, the heightened requirements of Rule 9(b) apply to claims of intentional misrepresentation.  See id.  They are also applicable to the fraudulent acts of mail fraud underlying a RICO cause of action.  Lum v. Bank of America, 361 F.3d 217, 223 (3d Cir. 2004).

The Delaware Consumer Fraud Act[11] is designed to protect consumers from unfair or deceptive merchandising practices, including: fraud, misrepresentation, false promises, and omission of material facts with intent that others rely upon such concealment.  Grand Ventures, Inc. v. Whaley, 632 A.2d 63, 65-66 (Del. 1993).  While the elements of a Consumer Fraud Act claim differ from common law fraud,[12] in all other respects the statute is interpreted in light of established common law concepts of fraud and deceit.  Stephenson v. Capano Dev., Inc., 462

---

[11]  The Delaware Consumer Fraud Act provides in pertinent part:

> [A]ny deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby, is an unlawful practice.

Del. Code. Ann. 6 § 2513(a).

[12]  The statute's elements depart from the common law in the following ways: (1) a negligent misrepresentation is sufficient to violate the statute, (2) a violation of the statute is committed regardless of actual reliance by the plaintiff, and (3) the plaintiff need not show intent by the defendant to induce action or inaction by the plaintiff.  Eames v. Nationwide Mut. Ins. Co., 412 F. Supp.2d 431, 437 (D. Del. 2006) (quoting Stephenson, 462 A.2d at 1074)).

A.2d 1069, 1074 (Del. 1983).  Accordingly, some courts have held that the Consumer Fraud Act

is subject to the requirements of Rule 9(b).  Coleman Dupont Homsey v. Vigilant Ins. Co., 496

F. Supp. 2d 433, 439-40 (D. Del. 2007) (citing Eames, at 412 F. Supp. 2d 431, 437 (D. Del.

2006)).

Complainants contend that Rule 9(b) does not apply because the elements depart from

common law fraud, citing State ex. rel. Brady v. Publishers Clearing House, 787 A.2d 111, 116-

17 (Del. Ch. 2001), as authority for this position.  The court in *Brady* held that the Chancery

Court version of Rule 9(b) did not apply to a claim brought under the Consumer Fraud Act by

the Delaware Attorney General.  Id. at 112.  This case is sufficiently distinguishable so as to not

control the disposition of the present issue, however.  The Attorney General of Delaware brought

the claim in *Brady*, and this was an important factor in the court's rationale for not applying the

heightened requirements, as the court found:

> [T]he remedial goals of these two acts are inconsistent with the application of the
> particularized pleading requirements of Rule 9(b) to enforcement actions brought by the
> Attorney General to protect the consuming public . . . . [C]laims under the two acts do not
> involve charges of moral turpitude and are unlikely to be brought by the State for purposes
> of harassment . . . . [A] requirement that the State plead with particularity the "who, what,
> where, and when" of each and every one of 750,000 violations alleged would serve only to
> defeat the legislative mandate to the Attorney General in bringing actions such of these on
> behalf of citizens of the state.

Id.  As such, the rationale relied on by the court does not apply with as much force to this case

where private individuals are asserting the claim.  See Coleman, 496 F. Supp. 2d at 439 (holding

that Rule 9(b) applied to a private cause of action brought under the Consumer Fraud Act and

that *Brady* was inapplicable).

Given the fraud label on the Consumer Fraud Act, the conduct that it is meant to curtail,

and the allegations relied on in the Complaint to support this cause of action, the gravamen of

this claim is quite obviously fraud.  In addition, application of Rule 9(b) here would further the

policy objectives of the rule.  A false allegation under the Consumer Fraud Act certainly has the

same potential to harm reputation and goodwill as an allegation of common law fraud.

Therefore, the Court finds that Rule 9(b) is applicable and the Consumer Fraud Act must be

plead with particularity.

### 2.  Negligent Misrepresentation

The parties agree that a claim of negligent misrepresentation is not covered by Rule 9(b).

(Doc. No. 55 at 10; Doc. No. 32 at 6).  No consensus has emerged on this issue, even among the

district courts within this Circuit.[13]  Because there is no clear consensus, the Court will accept

the parties' agreement.

Despite Rule 9(b) being inapplicable, the Movants' contend that a claim for negligent

misrepresentation must be plead with a degree of specificity, citing Floyd v. Brown &

Williamson Tobacco Corp., 159 F. Supp. 2d 823, 834 (E.D. Pa. 2001) (citing Southern Seafood

Co. v. Holt Cargo Sys., Inc., No. 96-5217 1997 WL 539763, *11 n.23 (E.D. Pa. Aug. 11, 1997)),

as support for this proposition.  *Floyd* involved a pro se Complaint against two cigarette

manufacturers for injuries allegedly sustained as a result of smoking cigarettes.  Id. at 826.  In

analyzing the joint motion to dismiss, the court devoted only a few sentences to the negligent

misrepresentation claim holding that a degree of specificity was required and finding that the

complaint contained no allegations concerning specific negligent misrepresentations.  There was

no discussion about the reasoning for this requirement or any standards for application of the

---

[13] *Compare* Toner 821 F. Supp. at 283 (finding that Rule 9(b) is applicable to negligent misrepresentation);
Breeden v. Richmond Cmty. Coll., 171 F.R.D. 189, 199-202 (finding the same after exhaustive review of the
authority and history of Rule 9(b)) *with*  Brandow Chrysler Jeep Co. v. DataScan Tech., 511 F. Supp. 2d 529, 537
(E.D. Pa. 2007) (holding Rule 9(b) inapplicable to claims of negligent misrepresentation).

holding, and the court solely relied on a footnote in *Southern Seafood*, an unreported case, as authority for the specificity standard it purported to apply.  See id.  The court in *Southern Seafood* also did not explain the authority or reasoning for requiring an extra degree of specificity in negligent misrepresentation claims, however, and seemingly applied the typical Rule 9(b) analysis to the claim.  See Southern Seafood, 1997 WL 539763, at *11 n.23.

Several cases in the Eastern District of Pennsylvania have relied on *Floyd* to require an extra degree of specificity for claims of negligent misrepresentation,[14] but the Court has not found (nor have the parties cited) any Third Circuit cases holding negligent misrepresentation claims to the same standard.  Given the above history of the "degree of specificity" requirement relied on by the Movants, the Court does not find the reasoning in *Floyd* persuasive and will not adopt it for the purposes of this motion.  A claim that does not fall under the special pleading requirements of Rule 9 is evaluated by the general pleading rules set out in Rule 8(a).  Fed. R. Civ. P. 8(a).  As such, the negligent misrepresentation claim will not be further considered in this section of the opinion.

### 3.  Application of Rule 9(b) to Counts I, IV, VIII, and XI

Rule 9(b) requires plaintiffs to plead the circumstances of fraud with particularity. Seville, 742 F.2d at 791.  Despite this, an approach focusing exclusively on the "particularity" language of the rule is too narrow because it ignores the contemplated flexibility and simplicity inherent in the pleading system adopted by the Federal Rules.  Id.  Plaintiffs do not have to make allegations of date, place, or time to satisfy the notice aspect of the Rule 9(b) requirement, but may "use alternative means of injecting precision and some measure of substantiation into their

---

[14] See,e.g., Brandow, 511 F. Supp. 2d at 537; Deverant v. Selective Ins. Co., Inc., No. 02-CV-3801 2003 WL 21282184 *3 (E.D. Pa. Jan. 07, 2003).

allegations of fraud."  Id. (holding that an attached detailed list identifying the machines which were the subject of the alleged fraudulent transactions was an adequate alternative means to satisfy Rule 9(b)).  The complaint also must include allegations detailing who made the misrepresentation, to whom, and the general content of the misrepresentation.  Lum, 361 F.3d at 227.

One serious deficiency with the Complaint is that after identifying AmerUs Group, AmerUs Life, and Indianapolis Life as separate corporate entities (Doc. No. 3 at 13-14 ¶¶ 4, 5, 6), it goes on to group them together as the "Insurance Company" for all the substantive allegations of the complaint.  (Doc. No. 3 at 14 ¶ 8 n.2.)  Typically, a plaintiff cannot sue multiple defendants for fraud merely by alleging fraud with particularity as to one defendant. Sandvik AB v. Advent Intern. Corp., 83 F. Supp.2d 442, 448 (D. Del. 1999) (citing Lachmund v. ADM Investor Services, Inc., 191 F.3d 777, 784 (7th Cir. 1999)).  In a case involving multiple defendants, each defendant is entitled to be apprised of the roles they each played in the alleged scheme, and absent a compelling reason, a plaintiff is not normally entitled to treat multiple corporate defendants as one entity.  Jepson, Inc. v. Makita Corp., 34 F.3d 1321, 1328-29 (7th Cir. 1994) (citing  Vicom Inc. v. Harbridge Merch. Servs., Inc., 20 F.3d 771, 777-78 (7th Cir. 1994)).  Though it may be convenient to lump defendants together for ease of reference, as the Court has done in this opinion, it is a luxury that the plaintiff should avoid when alleging acts of fraud in a complaint.  See Jepson, 34 F.3d at 1329.  One exception to this general rule is that vicarious liability need not be plead with particularity, so the principal can be held liable for the fraudulent acts of its agents if the agency relationship is adequately alleged.  Sandvik, 83 F. Supp.2d at 448; see also Petro-Tech, Inc. v. Western Co. of N. Am., 824 F.2d 1349 (3d Cir.

1987).  But here, the Complaint contains no allegations as to how these grouped together companies relate to each other, noting only that Indianapolis Life is a subsidiary to AmerUs Group.  (Doc. No. 3 at 13 ¶ 5.)  Further, the Complaint does not contain any allegations that explain the connection of AmerUs Life to the facts of this case beyond lumping it together with the other Defendant insurance companies.[15]

Even if the Court assumes that these related corporations can sort out their own involvement in the scheme and prepare a defense, see Jepson 34 F.3d at 1329, the allegations are also deficient because they do not include the date, place, or time that any of the misrepresentations took place.  The few alleged misrepresentations identified in the Complaint appear to have taken place between "early 2005 " and "March 14, 2005," during which, the Complainants allege that Saide and the group of Defendants comprising "Insurance Company" took significant steps in the conduct underlying this action, such as: advising the Wallaces to terminate an existing life insurance policy, providing them with the Initial Illustration, advising them to apply for loans from Credit Suisse, and eventually devising the plan to create the Trust and have the Trustee apply for the policy again.  (Doc. No. 3 at 14-16 ¶¶ 8-15.)  The date and time of these alleged events are never identified with specificity.  As discussed in the factual background section of this Memorandum, the lack of dates and times makes it difficult to construct a time line of the events that took place up until the first insurance policy was issued to

---

[15]  Paragraph 6 contains the entirety of the allegations regarding AmerUs Life:

> Third-Party Defendant AmerUS Life Insurance Co., an Iowa corporation, is an insurance company authorized to sell insurance and issue insurance policies in the State of Delaware, with an address at 611 Fifth Avenue, Des Moines, Iowa 50309, and a registered agent of James A. Smallenberger, 611 Fifth Avenue, Des Moines, Iowa 50309.

(Doc. No. 3 at 14 ¶ 6.)

the Wallaces.  There is also no mention of the place or method by which the misrepresentations were made to the Wallaces so there is no way to know whether these misrepresentations were in person, by phone, or mail (which is especially problematic for the underlying acts of mail fraud required to sustain the RICO claim).  Further, the Wallaces should have access to the dates and times of these misrepresentations because they were personally involved in all of the communications at issue.

Furthermore, the Complainants' brief in opposition does not attempt explain or account for the lack of these essential elements to the core allegations of the Complaint.  Instead, to account for the deficiencies, the Complainants rely on *Seville* and claim that allegations of date, place, or time are not required by Rule 9(b).  (Doc. No. 55 at 14.)  While this statement is generally true, the holding in *Seville* was based on the existence of some other means of injecting particularity into the complaint to satisfy the requirements of Rule 9(b).  The Complainants do not point out any other allegations or information that inject precision or substantiation into the claims that are lacking the time, place, and dates.  The brief in opposition also introduces further confusion by referring to the Wallaces and Trustee together as a single entity.[16]

Given the many vagaries of the Complaint and the goals of Rule 9(b) discussed above to provide notice to the Defendants and protect against frivolous lawsuits, it is clear that none of the misrepresentations or conduct underlying the fraud claims have been pled with sufficient particularity to meet even the somewhat relaxed Rule 9(b) standard articulated by the Third Circuit in *Seville*.  As such, Counts I, IV, VIII, and XI will be dismissed.

---

[16]  For example, after lumping the Wallaces and Trustee together as "Wallaces," (Doc. No. 55 at 5 n.1), the Complainants state in their brief in opposition that: "Saide . . . represented to the Wallaces (an elderly couple with little knowledge of insurance) that he would obtain and the Insurer could provide a premium financed policy conforming to the Initial Illustration and with a commencement date of December 2005."  (Doc. No. 55 at 9.)

**D.  The Duty of Good Faith and Fair Dealing**

The Movants argue that while Delaware recognizes a cause of action for breach of the duty of good faith and fair dealing, it only applies if the conduct in question is without reasonable justification.  (Doc. No. 32 at 10.)  The Movants conclude that the Complainants have failed to allege "either a duty arising from any specific contractual relationship or any conduct that lacked reasonable justification."  (Doc. No. 32 at 11.)  In response, the Complainants argue that the duty extends beyond reasonable justification and that the allegations of the complaint taken as a whole are sufficient to sustain this cause of action.  (Doc. No. 55 at 18.)

Under Delaware law, the implied covenant of good faith and fair dealing is best understood as a way of implying terms in the agreement, either to analyze unanticipated developments or to fill gaps in a contract's provisions.  Dunlap v. State Farm Fire and Cas. Co., 878 A.2d 434, 440-41 (Del. 2005).  The implied covenant attaches to every contract, including contracts of insurance.  Id. at 441.  Existing contract terms still control, so the implied terms cannot circumvent the parties' bargain to create a free-floating duty that does not exist in the underlying document or create a claim for breach on conduct authorized by the terms of the agreement.  Id.  The covenant requires that "a party refrain from arbitrary or unreasonable conduct that has the effect of preventing the other party to the contract from receiving the fruits of the bargain."  Id. at 442.  A party breaches the covenant if they frustrate the purpose of the contract by taking advantage of their position to control implementation of the agreement's terms.  Id. at 442.  To sufficiently plead a breach of the implied covenant of good faith and fair dealing, "the plaintiff must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff."  Anderson v. Wachovia

Mortg. Corp., 497 F. Supp. 2d 572, 582-83 (D. Del. 2007) (quoting Fitzgerald v. Cantor, No. 16297-NC 1998 WL 842316 at *1 (Del.Ch. Nov. 10, 1998).

In an insurance contract, this covenant essentially requires "the insurer act in a way that honors the insured's reasonable expectations." Id. at 444. Unlike a bad faith claim in the insurance context, a breach of this implied covenant can occur from conduct that does not deal with failing to promptly process and pay claims. Id.

Here, the Complaint is sufficient to sustain a claim for breach of the implied covenant of good faith and fair dealing. The Complainants specifically allege that the insurance companies did not deal with the Wallaces fairly throughout this process. (Doc. No. 3 at 30 ¶ 67.) Unfair conduct in a contractual relationship prevents the other party from receiving the fruits of the bargain so the Complainants can rely on the concepts of reasonableness and fairness as a specific implied contractual obligation. See Anderson, 497 F. Supp. 2d at 582. Additionally, a fair inference from several allegations within the Complaint is that there was a breach of this obligation. For example, it is alleged that Saide suggested the course of action and made all arrangements necessary to create the Delaware policy so that the Initial Illustration would apply. (Doc. No. 3 at 17 ¶¶ 15-16.) This conduct, if proved, could demonstrate that the insurer was taking advantage of their superior position to control implementation of the agreement's terms. The Complainants also allege that the movants "refused to produce a copy of the Delaware Policy, and never confirmed or denied the application of any illustration to the Delaware Policy." (Doc. No. 3 at 23 ¶ 29.)   It is alleged that this refusal caused significant additional costs for the Wallaces in investigating the matter (Doc. No. 3 at 24 ¶ 30), which also would implicate the covenant of good faith and fair dealing because an insurance company cannot take advantage of

its superior position such that it becomes a secondary source of injury to the insured.  <u>Dunlap</u>,

878 A.2d at 444.  Accordingly, the complaint is sufficient to sustain the claim for breach of the

duty of good faith and fair dealing.

### E.  Deceptive Trade Practices

Count IX of the Complaint asserts a claim based on the Delaware Uniform Deceptive

Trade Practices Act ("DTPA").  Del. Code. Ann. 6 § 2531 <u>et seq</u>.; (Doc. No. 3 at 31 ¶ 73.)  In

<u>Grand Ventures, Inc. v. Whaley</u>, 632 A.2d 63, 70 (Del. 1993), the Delaware Supreme Court held

that "a litigant has standing under the DTPA only when such person has a business or trade

interest at stake which is the subject of interference by the unfair or deceptive trade practices of

another."  After reviewing the legislative history and intent behind the statute, the court found

that the DTPA was designed to protect consumers from deceptive trade practices indirectly by

ensuring fair conduct among businesses.  <u>Id.</u>  As such, the court concluded that the DTPA

addresses unreasonable or unfair interference with horizontal relationships between various

business interests while the Consumer Fraud Act (asserted in Count VIII of the Complaint)

provided remedies for violations of the vertical relationship between a consumer and a producer

or seller.  <u>Id.</u>

Relying on <u>Brady v. Fallon</u>, No. 96A-12-010-RRC, 1998 WL 283438, at *4 (Del. Super.

Ct. Feb. 27, 1998), the Complainants contend that *Whaley* is no longer precedential because the

Delaware General Assembly amended the DTPA after the case was decided.[17]  (Doc. No. 55 at

26).  This argument cannot survive scrutiny, however, because the terms of the amendment only

---

[17]  The amendment added subsection (d) to Del. Code. Ann. 6 § 2533 which provides: "[t]he Attorney General shall have standing to seek, on behalf of the State, any remedy enumerated in this section for any violation of § 2532 of this title that is likely to harm any person, including but not limited to individual retail purchasers and consumers of goods, services or merchandise."  Del. Code. Ann. 6 § 2533(d).

give the Attorney General standing to bring suit for harm to individual consumers.  Del. Code.

Ann. 6 § 2533(d).  As such, *Fallon* is inapplicable because the action in that case was brought by

the Attorney General and not by a private consumer in his individual capacity.  See Johnson v.

Geico Cas. Co., 516 F. Supp. 2d 351 (D. Del. 2007).

Nothing in the Complaint suggests that the Complainants had a business or trade interest

that was the subject of interference by unfair trade practices.  Rather, the allegations show only

that they were private consumers of the insurance policy at issue.  Accordingly, the Court

concludes that the Complainants cannot maintain a private cause of action under the DTPA and

Count IX will be dismissed.

### F.  Leave to Amend

At the end of the brief in opposition, the Complainants state that, "[s]hould the Court

determine that the claims have not been pled sufficiently, the Wallaces respectfully request that

the Court grant leave to amend and replead pursuant to Federal Rule of Civil Procedure 15."

(Doc. No. 55 at 29.)

Requesting leave to amend at the end of the brief in opposition is not the proper method

to bring such a request before a court.  Ranke v. Sanofi-Synthelabo, Inc., 436 F.3d 197, 205-06

(3d Cir. 2006).  Instead, to request leave to amend, a draft amended complaint must be submitted

to the district court along with a formal motion so that the court has a basis to exercise its

discretion.  Id.  Failure to include the draft amended complaint is fatal to any motion to amend.

Id.  Accordingly, the Court will deny the Complainants request at this time, but would consider a

subsequent, properly presented motion to amend.  The Court notes, however, that leave to amend

is typically granted for dismissal for failure to comply with Rule 9(b), but not for amendments

that would prove futile.  <u>See</u> <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1434-35 (3d Cir. 1997).

## IV.  CONCLUSION

For the foregoing reasons, the Court will grant in part Movants' motions to dismiss counts I, III, IV, V, VI, VII, VII, IX, X, and XI of the counterclaim and third-party complaint. Counts I (fraudulent inducement), III (negligence),  IV (common law fraud), VI (bad faith breach of contract), VIII (consumer fraud), IX (deceptive trade practices), X (insurance fraud), and XI (RICO) will be dismissed.  Additionally, the Richard W. Wallace and Rebecca J. Wallace Irrevocable Trust will be dismissed from this action.  An order consistent with this Memorandum Opinion will follow.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **INDIANAPOLIS LIFE INSURANCE COMPANY,** | : | |
| | : | |
| | : | |
| **Plaintiff** | : | |
| | : | **CIVIL ACTION NO. 1:06-CV-2152** |
| | : | |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| **DEBORAH HENTZ, Trustee, et al.** | : | |
| | : | |
| **Defendants** | : | |
| | : | |
| **· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·** | : | |
| | : | |
| **RICHARD W. WALLACE et al.,** | : | |
| | : | |
| **Third-Party Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **AMERUS GROUP CO. et al.** | : | |
| | : | |
| **Third-Party Defendants** | : | |

## ORDER

**AND NOW**, this 30th day of September, 2008, upon consideration of the Defendants'

Motions to Dismiss (Doc. Nos. 31, 38) the counterclaim and third-party complaint (Doc. No. 3)

filed in the above-captioned matter, and for the reasons set forth in this Court's Memorandum

Opinion filed herewith, **IT IS HEREBY ORDERED** that said Motions are **GRANTED IN**

**PART** and **DENIED IN PART**.

As to Counts I (fraudulent inducement), III (negligence),  IV (common law fraud), VI

(bad faith breach of contract), VIII (consumer fraud), IX (deceptive trade practices), X

(insurance fraud), and XI (RICO), the motions to dismiss are **GRANTED.**  These Counts are

**DISMISSED**.        As to Counts V (negligent misrepresentation) and Count VII (breach of the duty of fair dealing) the motions are **DENIED**.

        **IT IS FURTHER ORDERED** that the Counterclaim and Third-Party Plaintiffs request for leave to amend the counterclaim and third-party complaint is **DENIED** without prejudice to file a proper motion for leave to amend.

        **IT IS FURTHER ORDERED** that Defendant The Richard W. Wallace and Rebecca J. Wallace Irrevocable Trust is **DISMISSED** from this action.


                                                     s/ Yvette Kane
                                                    Yvette Kane, Chief Judge
                                                    United States District Court
                                                    Middle District of Pennsylvania

2